**WALLER PEANUT CO. v. LEE COUNTY PEANUT CO.**

No. 9700.

Court of Civil Appeals of Texas. Austin.
Feb. 18, 1948.

Wm. F. Jackson, of Hempstead, and Pitts & Liles, by J. R. Liles, of Conroe, for appellants.

John S. Simmang and E. T. Simmang, both of Giddings, for appellees.

McCLENDON, Chief Justice.

Appeal from an interlocutory order overruling a plea of privilege seeking to change the venue from Lee County to Waller County, where appellants reside.

Venue in Lee County was asserted by appellees under the following provision of Sub. 7 of Art. 1995, Vernon's Ann.Civ.St.: "In all cases of fraud * * * suit may be brought in the county in which the fraud was committed * * *"; the fraud consisting in the delivery by appellees to appellants in Giddings (Lee County) of a truck load of peanuts under a contract of purchase made by appellants with the undisclosed intention on their part at the time it was made and the peanuts were delivered to them, of not performing it. The suit was for the market value of the peanuts at the time and place of delivery and for exemplary damages and attorney's fees.

The trial was to the court, and the controlling issue here is whether the evidence viewed most favorably for appellees, will support the judgment. Briefly and substantially stated the evidence shows: Sell and Fricke, the appellees, were partners in the

business of buying and selling peanuts at wholesale, residing and doing business at Giddings under the firm name of Lee County Peanut Company. Flowers and Brejcha, the appellants, were partners engaged in buying, processing and selling peanuts at Waller (in Waller County), where they resided. Prior to May 6, 1947, appellants had purchased from appellees several truck loads of peanuts; the course of business being for appellants to send their truck to Giddings, into which the peanuts were there loaded and brought by appellants to Waller. The peanuts were weighed (after being loaded) at Giddings, unless the truck was too large for the scales there, in which event they were weighed at Waller. Upon ascertaining the weights appellees would "bill" appellants for the peanuts at the agreed price and appellants would thereupon mail to appellees their check for the amount drawn to appellees' order upon appellants' bank at Waller. The check would then be collected through banking channels. The peanuts here involved were contracted for in accordance with this course of dealing and delivered to appellants at Giddings on May 6, 1947, appellants sending their truck and accepting delivery at Giddings. The truck being too large for the Giddings scales, the weighing was at Waller. Appellants sent appellees their check, dated May 10, 1947, for $3,435.-87 (the amount due according to the Waller weights and contract price), which was deposited for collection through usual banking channels. Payment was stopped by appellants, Flowers wiring appellees on May 13, 1947: "Payment stopped on check for $3,435.87. Wait your reply on adjustment of Oklahoma seed peanuts." There was no question regarding the May 6th sale, and the only reason payment was stopped was either: (1) To force an adjustment of a claim for damages for breach of warranty asserted by appellants against appellees arising out of a prior sale (April 21, 1947) of a load of peanuts purchased and paid for under the stated course of dealing, appellants claiming that the April 21st seed were purchased for planting purposes, and turned out to be worthless for that purpose; or (2) to force appellees to sue on the May

6th contract in Waller County, so that appellants might litigate in that county, as a cross-action to such suit, their said claim for damages under the April 21st sale. "Oklahoma seed peanuts" in the above telegram referred to the April 21st sale. So far the evidence is without substantial dispute.

Appellees' claim of an intention on appellants' part not to pay for the May 6th peanuts in accordance with the contract, is predicated upon an admission of Flowers made to Sell and his attorney Simmang, when they went to Waller shortly after payment of the check was stopped, to try to collect for the May 6th peanuts. The testimony of these two regarding the substance of this admission is substantially the same. Sell testified that Flowers "told me that he didn't feel big enough to handle this thing, so he went to see his lawyer and his banker and they advised him to get another load of peanuts to make these good that didn't come up, and to stop payment on the check, so that we would have to sue him in Waller County. * * * I told him that we were going to have to sue him for the check, and he said that's what he expected us to do, that that's the reason he handled it that way, so we would have to sue him in Waller County, rather than for him to have to sue us in Lee County." Simmang testified: "We went down to try to collect for this load of peanuts he had got. So, in talking to Mr. Flowers he he made the statement—he said, 'The load of peanuts I got from you before I've had to make good to all these farmers and they have been on my neck and I just can't stand the loss.' He says, 'I went to see my lawyer and I've talked to my banker, and my lawyer told me I would have to go down to Lee County to sue you—the thing to do is to go down and get another load of peanuts and stop the payment on the check for them and they'll have to come up here to Waller County to sue me.' That's the substance of the statement that Flowers made before both Mr. Sell and me."

Flowers denied that he made such admission, testifying that the first time he conceived the idea of stopping payment on the

check was on the morning of May 13th, when he first consulted his lawyer. Whereupon he stopped the payment and sent the above telegram. There was evidence to support findings that appellees had no notice or knowledge of any claim regarding the April 21st sale until the matter was mentioned by Flowers in a conversation with Sell at the Galveston Peanut Convention, which took place May 11-13; and that appellees would not have made the sale had they known that payment would not be made in the usual way.

■ The principle which controls this appeal is thus stated in the ALI Restatement of the Law of Contracts, Vol. 2, p. 900, § 473: "A contractual promise made with the undisclosed intention of not performing it is fraud." Among the illustrations given on p. 901, is the following: "A, in response to an order received from B, contracts to send B a shipment of goods. B when he gives the order intends not to pay for the goods. Though B makes no promise to pay except that which is to be inferred from the order, and though he is solvent and A could recover the price if he sold B the goods, A's promise is voidable for B's fraud."

In the Texas Annotations the following cases are cited as supporting the text: Cearley v. May, 106 Texas 442, 107 S.W. 725; Chicago T. & M. C. Ry. Co. v. Titterington, 84 Tex. 218, 19 S.W. 472, 31 Am.St. Rep. 39. See also 37 Texas Jur., § 288, p. 632, and 46 Am.Jur., § 83, p. 273.

■ The following statement is from Boerner v. Cicero-Smith Lbr. Co., Tex. Com.App., 298 S.W. 545, 547:

"Even though there was no express false statement at the time of the purchase, nevertheless the act of purchasing upon a cash basis necessarily implied that the purchaser intended to pay for the merchandise, and if he secretly intended not to pay therefor, his conduct would be such fraud as would be actionable. The application for credit, or for the delivery of, the goods, is a representation by implication of the existence of an intent to pay therefor, and likewise a representation by implication of the nonexistence of an intent not to pay."

■ The above evidence was clearly sufficient to support the action as one for fraud committed in Lee County.

Appellants insist there was no evidence of any promise or representation made in Lee County. That is wholly immaterial. The fraud was consummated by appellants' obtaining possession of the peanuts in Lee County, under the promise, express or implied (it matters not which), to pay for them in the customary way. It is also contended that there was no evidence to support appellees' allegation that Flowers accompanied the truck to Giddings. The evidence is somewhat obscure upon this point. However, it is of no consequence whether Flowers accompanied the truck. It was appellants' truck driven by appellants' employee, under appellants' direction and authority.

■ Appellants also contend that the suit is upon the contract of purchase and not for fraud. We cannot accept this construction of appellees' petition. It was clearly and unequivocally a suit for the market value of the peanuts (plus attorney's fees and exemplary damages), predicated upon allegations that the peanuts were obtained (as stated) by fraud. The fact that the petition also alleged that the market value and contract value of the peanuts was the same was immaterial. Flowers admitted the correctness of that statement. Appellees could not have recovered on the contract under their allegations. They could only recover under their allegations of a fraudulent conversion of their property in Lee County.

Appellants cite a number of cases as supporting their contentions. They are all distinguishable in their controlling facts, from the case here presented, or are suits predicated upon contract in which the alleged fraud was merely incidental. It would serve no useful purpose to cite or analyze them.

■ Appellants further complain of admission in evidence of a paragraph in their answer filed subject to their plea of privilege. Assuming, arguendo, that this was error, it was nevertheless harmless. It only stated what Flowers himself testified

to, that there was a breach of warranty in the prior sale. Furthermore, the case was tried to the court, and its order was amply supported by other evidence. We cannot see in what way this allegation added substantially to appellees' case.

The order appealed from is affirmed.

Affirmed.